UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH FABIAN,<br>Plaintiff,<br><br>v.<br><br>HOSPITAL OF CENTRAL<br>CONNECTICUT, *et al.*,<br>Defendants. | No. 3:12-cv-1154 (SRU) |

<u>**MEMORANDUM OF DECISION AND ORDER**</u>

The plaintiff in this case, Dr. Deborah Fabian, brings this action under Title VII of the

Civil Rights Act and the Connecticut Fair Employment Practices Act ("CFEPA"). She alleges

that she was very nearly hired as an on-call orthopedic surgeon at the Hospital of Central

Connecticut and relied reasonably and substantially on the impending finalization of her hiring,

but that the hospital declined to hire her because she disclosed her identity as a transgender

woman who would begin work after transitioning to presenting as female. The hospital moves

for summary judgment on the grounds that Dr. Fabian has not met her burden under the

*McDonnell Douglas* burden-shifting framework, because she would have been an independent

contractor rather than an employee and therefore is not covered by the relevant statutes, and

because Title VII (and the CFEPA at the time of the alleged discrimination) does not prohibit

employment discrimination on the basis of transgender identity. For the reasons discussed below,

I reject all three arguments and deny the Hospital's motion.

I.      **Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.    Background

Deborah Fabian is an orthopedic surgeon and a transgender woman.[1] She alleges that she was very nearly hired by the Hospital of Central Connecticut ("HCC" or the "Hospital") as an on-call orthopedic surgeon for its Emergency Department, albeit with the involvement of a third-party provider of physicians and management services—Delphi Healthcare Partners, Inc.

---

[1] Some of the cases that will be discussed below use the word "transgender," some use the word "transsexual," and some use both. I preserve the terminology in direct quotations but otherwise use the term "transgender." "Transsexual" is an older term with a more clinical origin, and though it is used by some people who identify with it, it is not favored by others. *See generally* GLAAD Media Reference Guide—Transgender Issues, http://www.glaad.org/reference/transgender. "Transgender" appears to be the more inclusive term, and it is the one Fabian uses of herself, so I follow her practice. Relatedly, the briefs on the present motion are inconsistent in their use of masculine and feminine pronouns. The better practice is to defer to the preference of the individual to whom the pronouns refer, *see id.*, and I accordingly use feminine pronouns throughout in deference to what would appear to be Fabian's preference.

("Delphi")—that the Hospital used as a means to find physicians. Fabian entered the hiring process with Delphi and subsequently went to interview at HCC believing that she was all but hired. At that time, she was publicly presenting as male and was known as David Fabian; she informed her interviewers at the end of her interview, however, that she is a transgender woman and transitioning to presenting as female, and that she would work at the hospital as Deborah Fabian. She subsequently learned that she would not be hired, and she alleges that she would have been except for her disclosure of her identity as a transgender woman. She alleges that the interview was barely more than a formality, that she had already been told she would get the job, that she had already been given a contract with a start date (which she executed and returned), and that it was in reliance on that reasonable understanding that she and her wife sold their home in Massachusetts.

Fabian's four-count complaint alleges that Delphi (Counts One and Two) and HCC (Counts Three and Four) violated Title VII of the Civil Rights Act and the CFEPA. The present motion for summary judgment was filed only by HCC with respect to Counts Three and Four.[2] HCC asserts that it chose not to hire Fabian not because she is a transgender woman but because she showed what her interviewers perceived as reluctance (or insufficient enthusiasm) about late-night calls to the Emergency Department and their new electronic records systems, and that she wanted to perform more surgery, which is not what the job would likely entail. HCC also claims that the "contract" she received was merely a sample contract. Moreover, HCC argues that its relationship to Fabian if she had been hired would not have been as employer under Title VII,

---

[2] HCC states both that Delphi "will likely have all counts against it withdrawn in the near future," Def.'s Mem. 1, and that it "is no longer a defendant in this matter," *id.* at 2 n.3. In fact Delphi is still a defendant and the counts have not yet been withdrawn. It may be that HCC was mistaken, that circumstances have changed, or that Delphi intends to settle and has postponed finalizing a settlement until after a ruling on the issues in this motion, but in any event it is still formally a defendant and has not filed any dispositive motions.

because she would have been an independent contractor of Delphi, and thus an independent contractor of an independent contractor; and that, in any case, discrimination on the basis of transgender identity is not prohibited by Title VII and was not prohibited by the CFEPA at the time. In sum, HCC argues that summary judgment should be granted because: (1) HCC had legitimate nondiscriminatory reasons not to hire Fabian, which Fabian has not shown to be pretextual; (2) even if HCC had hired Fabian, it would not have been her "employer" under Title VII or the CFEPA; and (3) transgender is not a protected status under Title VII and was not a protected status under the CFEPA at the time of the events giving rise to this case, and the subsequent amendment of the CFEPA to cover that status should not be applied retroactively.

## III.     Discussion

The central factual dispute in this case is whether the decision not to hire Fabian was or was not made as a result of her transgender identity. If she would have been an independent contractor rather than an employee under Title VII and the CFEPA and therefore not covered by the statutes anyway, or if transgender status is not cognizable under them, then that factual dispute is immaterial. I will address those arguments below. But assuming for the moment that the discrimination she alleges is not outside the scope of the protective statutes, her claim is subject to the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because in this case that analysis is relatively simple, I will take it up first.

### A.   *McDonnell-Douglas* Burden Shifting

It is unlawful under Title VII for an employer "to fail or refuse to hire … any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

5

§ 2000e-2(a). Discriminatory failure-to-hire claims under Title VII[3] are analyzed under the

familiar burden-shifting framework of *McDonnell Douglas*. Under that test:

> a plaintiff complaining of a discriminatory failure to hire must first
> make out a *prima facie* case of discrimination by showing that (1)
> [she] is a member of a protected class, (2) [she] was qualified for
> the job for which [she] applied, (3) [she] was denied the job, and
> (4) the denial occurred under circumstances that give rise to an
> inference of invidious discrimination. Once the plaintiff has made
> such a *prima facie* showing, the burden shifts to the employer to
> come forward with a nondiscriminatory reason for the decision not
> to hire the plaintiff. If the employer articulates such a reason, the
> plaintiff is given an opportunity to adduce admissible evidence that
> would be sufficient to permit a rational finder of fact to infer that
> the employer's proffered reason is pretext for an impermissible
> motivation.

*Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).

There is no dispute that Fabian was qualified for the job and that she was denied it.

Whether she is a member of a protected class pertinent to her claim is disputed and is addressed

below. Assuming for now that she is, she need only show that "the denial occurred under

circumstances that give rise to an inference of invidious discrimination" to make her *prima facie*

showing. She has proffered evidence that she was led to believe she was all but formally hired,

that she received some sort of contract (though its significance is disputed), that she relied to her

detriment on such representations to such an extent that she sold her home in Massachusetts, that

she was not hired after disclosing her transgender identity, and that other doctors who are not

---

[3] The relevant federal precedent is generally applicable to CFEPA claims as well. *See, e.g.*, *Levy
v. Commission on Human Rights and Opportunities*, 236 Conn. 96, 103 (1996) ("Although this
case is based solely on Connecticut law, we review federal precedent concerning employment
discrimination for guidance in enforcing our own anti-discrimination statutes."); *Wroblewski v.
Lexington Gardens, Inc.*, 188 Conn. 44, 53 (1982) ("In interpreting and applying [CFEPA] we
are properly guided by the case law surrounding federal fair employment legislation, since this
court has previously confirmed our legislature's intention to make the Connecticut statute
coextensive with the federal." (citation and quotation omitted)).

transgender were subsequently hired. Taken together, that evidence is easily sufficient to give rise to an inference of discrimination. Assuming that the employment relationship in question is covered by the statute and that Fabian is a member of a protected class because discrimination on the basis of transgender identity constitutes sex discrimination, her *prima facie* case is therefore easily made. HCC proffers nondiscriminatory reasons for not hiring her—that in an interview she expressed reluctance about being called in to the Hospital at late hours and about the Hospital's new electronic recordkeeping systems, and wanted to perform more surgery—but the factual basis of those reasons (*i.e.*, the statements Fabian made in the interview) is disputed. A reasonable jury could find that those reasons were mere pretext and that Fabian's disclosure of her gender identity was the reason she was not hired. The Hospital's motion for summary judgment should therefore not be granted on the basis of any failure of Fabian to meet her burden under the *McDonnell-Douglas* framework.

B. Employee or Independent Contractor

"Title VII cover[s] 'employees,' not independent contractors," *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000), but the mere fact that HCC formally designates its doctors as "independent contractors" does not make them so (or, rather, it does not exclude them as "employees") under Title VII. Instead, the question "whether a worker is an 'employee'—or whether he or she is merely an independent contractor—requires the application of the common law of agency. In turn, whether a hired person is an employee under the common law of agency depends largely on the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid*." *Id.* at 113–14 (citations omitted). The *Reid* factors are:

> [1] the hiring party's right to control the manner and means by which the product is accomplished . . . [;] [2] the skill required; [3]

> the source of the instrumentalities and tools; [4] the location of the
> work; [5] the duration of the relationship between the parties; [6]
> whether the hiring party has the right to assign additional projects
> to the hired party; [7] the extent of the hired party's discretion over
> when and how long to work; [8] the method of payment; [9] the
> hired party's role in hiring and paying assistants; [10] whether the
> work is part of the regular business of the hiring party; [11]
> whether the hiring party is in business; [12] the provision of
> employee benefits; and [13] the tax treatment of the hired party.

*Reid*, 490 U.S. 730, 751–52 (1989) (footnotes omitted).

Weighing the *Reid* factors is a highly fact-specific task, and "a court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of indeterminate weight—that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor." *Eisenberg*, 237 F.3d at 114 (quotation omitted). *See also Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 110–11 (2d Cir. 1998) ("Not all the *Reid* factors will be significant in every case, and we must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances before us."). The *Reid* factors are also "a non-exhaustive list of factors to be considered," because they merely seek to synthesize the common law of agency. *Frankel v. Bally*, 987 F.2d 86, 90 (2d Cir. 1993). They act, therefore, as a kind of starting point—some of them might not be significant in a particular case, and other factors not listed in *Reid* may matter instead. In general, "[t]hough no single factor is dispositive, the greatest emphasis should be placed on the first factor—that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks. The first factor is entitled to this added weight because, under the common law of agency, an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the 'manner and

means' by which the purported employee brings about that result." *Eisenberg*, 237 F.3d at 114

(citations and quotations omitted).[4]

It is clear that doctors who staff hospitals will often fall near the borderline, and under the

*Reid* factors or the common law of agency they may seem in some ways to be a hybrid of

employee and independent contractor. Hospitals, by setting policy and performance review

procedures, may have significant control over the "manner and means" of a doctor's practice, yet

medicine is a highly skilled profession and doctors will necessarily always maintain a significant

degree of autonomy. Hospital physicians are not for that reason, however, simply excluded as a

class from protection under Title VII. The Second Circuit has reversed a grant of summary

judgment that overemphasized the role of professional judgment as a factor militating against

"control over the manner and means of one's work," because such overemphasis "would carve

out all physicians, as a category, from the protections of the antidiscrimination statutes. While a

physician, like any professional, must be given latitude in which to choose a course of action,

especially considering the exigencies of medical practice, the mere existence *vel non* of that

latitude is not dispositive of the manner-and-means test." *Salamon v. Our Lady of Victory Hosp.*,

514 F.3d at 228–29. The Second Circuit held that "[w]hile summary judgment may be

appropriate in some cases concerning staff physicians suing hospitals, it is not appropriate in all,"

---

[4] I briefly note that the question whether it is ultimately for the court or a jury to find that an individual is an employee or an independent contractor remains unsettled, as the Second Circuit noted in *Salamon v. Our Lady of Victory Hospital*, 514 F.3d 217, 231 n.15 (2d Cir. 2008), *as amended* (Apr. 22, 2008). The issue was not briefed or argued before the Second Circuit in *Salamon*, so the Court merely collected divergent authority and indicated that the district court should consider it in the first instance. The Second Circuit had previously held, however, that "[t]he District Court's determination as to the presence or absence of each *Reid* factor is a finding of fact which [is reviewed] for clear error" and that its "ultimate determination as to whether a worker is an employee or an independent contractor—that is, the District Court's balancing of the *Reid* factors—is a question of law which [is reviewed] *de novo*." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 115 (2d Cir. 2000). I need not resolve that question at this stage of the case.

and in that particular case, the plaintiff had "demonstrated a genuine factual conflict regarding the degree of control [the hospital] exercised over her." *Id.* at 231. The source of tools and instrumentalities, as well as the location of work, will weigh in favor of seeing hospital physicians as employees; the duration of employment, the right to assign additional projects, the degree of discretion over when and how long to work, the method of payment, the doctor's role in hiring and paying assistants, and various other factors, are likely to vary widely from case to case.

The decision about employee status in a failure-to-hire case like this one may be even harder than in other cases of staff physicians suing hospitals, because the physician never started work and some of the dynamics that would have obtained are therefore less apparent. It is clear, however, that under the agreement that HCC had with Delphi (and under the contract Fabian received and executed), any doctors hired would be subject to the Hospital's bylaws, rules, regulations, policies, and procedures. They would be required to maintain "Medical Staff privileges" and appropriate credentials. Their schedules were to be subject to Hospital review and approval (though the extent of control over their own schedules remains unclear). They would be required to participate in the Hospital's programs pertaining to quality assurance, medical audit, risk management, utilization review, safety, infection control, and peer review, and to participate in various compliance programs. They would be required to follow policies and procedures with respect to medical records and timekeeping, to participate in staff committees, and to attend staff meetings, and the Hospital would have broad authority over administration generally. Doctors would have supervisory responsibility over hospital employees (and would not, for instance, hire their own staff and assistants).

The Hospital's right to control the manner and means of Fabian's work would be far less than in the case of less skilled workers, but the high degree of skill and autonomy involved in being a physician is not a *per se* bar on employee status. She would have had far *less* autonomy—and the Hospital would have had correspondingly greater control over the manner and means of her work—than she would have had in an individual practice, or in a partnership with a few other doctors, or if she merely had privileges to use the Hospital's facilities but was responsible for bringing in her own patients or performing her own billing (both tasks, in this case, were performed through the Hospital).

The location of the work and the source of the instrumentalities and tools weigh in favor of employee status. The duration of the relationship between the parties also weighs in favor of employee status, insofar as Fabian would not have been brought in to perform a specific task until completion—like a contractor hired to shingle a roof—or a particular task intermittently on an as-needed basis, but would become a regular part of the Hospital personnel. The Hospital's interest and involvement in the hiring process, and the fact that it interviewed and declined to hire Fabian, weigh still further in favor of employee status. If the Hospital had simply contracted with Delphi to fill its staffing needs in the way many businesses outsource custodial duties, for instance, Delphi would have hired whomever Delphi hired and the Hospital would have had little say in the matter. By interviewing and considering candidates, the Hospital was undertaking a traditional employer's task, and was not relying on Delphi to perform the tasks of a medical practice with its own staff but rather was relying on it to provide candidates for consideration by Hospital staff.

None of those factors is dispositive, and I do not consider their balance to be obvious in this case, but it does appear that the relationship Fabian would have had with the Hospital if she

had been hired would have been more like a traditional employee than like a traditional independent contractor. I need not decide now as a matter of law that Fabian would have been an employee under Title VII and foreclose further evidence and argument on the issue (and she has not cross-moved for summary judgment on it), and I do not do so. But I conclude that when construing the facts of record in the light most favorable to the nonmoving party and resolving all ambiguities and drawing all reasonable inferences against the moving party, the Hospital has not shown that Fabian as a matter of law would not have been an employee under Title VII, and summary judgment should not be granted on that basis.

C.   Transgender Identity and Title VII

Title VII of the Civil Rights Act, as amended, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The effect of the words "because of . . . sex" is called into question in this case. Specifically, the parties disagree about the scope of those words' meaning, and whether they prohibit employment discrimination against transgender people because they are transgender people, or if they only encompass discrimination against women (transgender or otherwise) because they are women and men (transgender or otherwise) because they are men. Framed differently, the question is this: If an employer does not discriminate against women as a class or against men as a class, but does discriminate against transgender people (irrespective of whether they are transgender men or transgender women), does that employer violate Title VII?

Neither the Supreme Court nor the Second Circuit has ever addressed that question.[5] Several other Circuits have addressed it, however, and though most of the earliest cases held that Title VII does not protect gender identity, the weight of authority has begun to shift the other way, especially (though not uniformly) after the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Because it is an open question in this Circuit, I consider the reasoning of other courts and closely examine the language of the statute below.

### 1.  *The Early Cases and Congressional Intent*

The earliest appellate decisions to examine the applicability of Title VII to discrimination on the basis of transgender identity were *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977),[6] and *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748 (8th Cir. 1982). In each case, the respective Circuit held that Title VII does not prohibit such discrimination, and subsequent cases that have come to the same conclusion have generally followed the same or essentially similar reasoning (as the Hospital urges me to do in the present case). *Holloway* and *Sommers* (and their progeny) were decided principally on two grounds: (1) the "traditional" definition or "plain" meaning of the word "sex," and (2) the intention of Congress.

---

[5] The nearest the Second Circuit has come to addressing the question was in *Mario v. P & C Food Markets, Inc.*, when it noted that "[i]t is also not clear that Mario, as a transsexual, is a member of a protected class," and cited (without elaboration) two cases from other circuits that will be discussed below. 313 F.3d 758, 767 (2d Cir. 2002). The Court did not need to reach the question, however, so it did not discuss it beyond that brief remark.

[6] *Holloway* is no longer good law in the Ninth Circuit, but the opinion that announced that fact did not formally overrule it; rather, it announced that "*Holloway* has been overruled by the logic and language of *Price Waterhouse* [*v. Hopkins*]," a Supreme Court decision that will be discussed below. *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000). If the Ninth Circuit is correct (and I think it is, for reasons that will follow), then *Sommers* is similarly abrogated, though the Eighth Circuit has not yet acknowledged it.

The Ninth Circuit in *Holloway* acknowledged that "[t]here is a dearth of legislative history" on the relevant provision, at least in part because "[t]he major concern of Congress at the time the Act was promulgated was race discrimination," and "[s]ex as a basis of discrimination was added as a floor amendment one day before the House approved Title VII, without prior hearing or debate." 566 F.2d at 662. The Court noted, however, that "the clear intent" of the Title VII amendments in the Equal Employment Opportunity Act of 1972—though that Act did not alter the relevant provision—"was to remedy the economic deprivation of women as a class." *Id.* The Court reasoned that "[g]iving the statute its plain meaning" is sufficient to show that "Congress had only the traditional notions of 'sex' in mind," *id.*, and concluded that "Congress has not shown any intent other than to restrict the term 'sex' to its traditional meaning." *Id.* at 663. *But see id.* at 664 (Goodwin, J., dissenting) (reasoning that discrimination because plaintiff "had changed her sex . . . would have to be classified as [discrimination] based upon sex"). The Court referred several times to the "plain" meaning or "traditional" definition of sex and included a quotation from *Webster's Seventh New Collegiate Dictionary* in a footnote, *see id.* at 662 n.4, but it did not discuss the language of the statute at length or engage with any definition in depth.

The Eight Circuit in *Sommers* ruled along the same lines. "[F]or purposes of Title VII," the Court held, "the plain meaning must be ascribed to the term 'sex' in absence of clear congressional intent to do otherwise," and "the legislative history does not show any intention to include transsexualism in Title VII." 667 F.2d at 750. Like the *Holloway* Court, the *Sommers* Court acknowledged that the word "sex" was added to Title VII in an amendment "one day before the House passed the Act without prior legislative hearings and little debate," but it nevertheless reasoned that "[i]t is . . . generally recognized that the major thrust of the 'sex'

14

amendment was towards providing equal opportunities for women." *Id.* The Court therefore held that "discrimination based on one's transsexualism does not fall within the protective purview of the Act." *Id.*

Both *Holloway* and *Sommers* rely on the supposedly "plain" or "traditional" meaning of the word "sex," but they do not elaborate on that supposed meaning; and, as I will discuss below (and as one might infer from Judge Goodwin's *Holloway* dissent), their treatment of the word is superficial. The apparently dual grounds for those decisions might therefore be collapsed into one, because both decisions use the "plain" meaning of the statute as a proxy for Congressional intent: rather than examining what the word "sex" means, they intuit what Congress must have intended the statute to do with respect to sex (while acknowledging that there is virtually no legislative history to guide them).

In the years since *Holloway* and *Sommers*, the use of legislative history and congressional intent has become more controversial and less prominent in statutory interpretation, and the addition of the word "sex" to Title VII is about as vivid an example imaginable of why that change occurred. U.S. District Judge John F. Grady in the Northern District of Illinois (in a decision issued from the bench and reported in the form of a transcript) disagreed with *Holloway* and *Sommers* about the Congressional intent behind the sex amendment to Title VII:

> those who have looked a little further into the matter know that this amendment introducing sex into the picture was a gambit of a Southern senator who sought thereby to scuttle the whole Civil Rights Act, and, much to his amazement and no doubt undying disappointment, it did not work. We not only got an act including race discrimination, which he had sought to bar, but we got sex as well.

*Ulane v. Eastern Airlines, Inc.*, 581 F. Supp. 821, 822 (N.D. Ill. 1983) ("*Ulane I*"), *rev'd*, 742 F.2d 1081 (7th Cir. 1984) ("*Ulane II*"). There may be some uncertainty about the precise motives of that Southern congressman (who was not a senator, as Judge Grady said, but Representative

Howard Smith of Virginia), but he was ostensibly an opponent of the bill, and it is clear that adding the word "sex" to Title VII was regarded by some of his colleagues as a welcome expansion of the Civil Rights Act's protective scope and by others as a prank or a poison pill to prevent it from becoming law.[7] Even if one considers some conception of a coherent and singular congressional intent to be a useful interpretive tool, it must be acknowledged that any such conception will, at least in cases like this one, be a legal fiction: there simply was no coherent and singular intent. Judge Grady thus disregarded the question of what Congress intended to do when it added the prohibition of sex discrimination to Title VII, asking instead: "What did we get when we got sex?" *Id.*

Fifteen years later, Justice Scalia writing for a unanimous Supreme Court applied that same lens to Title VII in a decision holding that male-on-male sexual harassment claims fall under its purview:

> As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). When Judge Grady disregarded the question of "the principal concerns of our legislators" and looked instead to the provision of the law itself—that is, to what "we g[o]t when we got sex" in Title VII—he concluded that the complaint before him, which alleged employment discrimination on the basis of transgender identity, clearly alleged discrimination that was "related to sex or had something

---

[7] *See generally* Jo Freeman, *How "Sex" Got Into Title VII: Persistent Opportunism as a Maker of Public Policy*, http://www.jofreeman.com/lawandpolicy/titlevii.htm; Louis Menand, *The Sex Amendment: How women got in on the Civil Rights Act*, THE NEW YORKER, July 21, 2014, http://www.newyorker.com/magazine/2014/07/21/sex-amendment.

to do with sex." *Ulane I*, 581 F. Supp. at 822. He characterized that conclusion as a "layman's reaction to the simple word," *id.*, and held that "the term, 'sex,' as used in any scientific sense and as used in the statute can be and should be reasonably interpreted to include among its denotations the question of sexual identity and that, therefore, transsexuals are protected by Title VII." *Id.* at 825.

The Seventh Circuit reversed that decision. It agreed with and restated Judge Grady's summary of the circumstances of the sex amendment's adoption—it called the amendment "the gambit of a congressman seeking to scuttle" the Act, *Ulane II*, 742 F.2d at 1085—but it nevertheless indicated, perhaps paradoxically, that its responsibility was "to interpret this congressional legislation and determine what Congress intended when it decided to outlaw discrimination based on sex." *Id.* at 1084. The Court took the "total lack of legislative history supporting the sex amendment coupled with the circumstances of the amendment's adoption" as an indication that "Congress never considered nor intended that this . . . legislation apply to anything other than the traditional concept of sex." *Id.* at 1085. The *Ulane II* Court thus relied, as the *Holloway* and *Sommers* courts relied, on what it characterized as the "traditional concept of sex" and the "plain meaning" of the statute, *id.*, but it did not examine why or how that meaning differed from Judge Grady's "layman's reaction" in *Ulane I* (which also appears to have been Judge Goodwin's reaction in his *Holloway* dissent). Rather, it simply asserted that "[t]he phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men." *Id.* As the *Ulane II* Court saw it, to construe the provision as doing anything more would be "to judicially expand the definition of sex . . . beyond its common and traditional

interpretation," and only Congress has the prerogative to decide "whether it wants such a broad sweeping of the untraditional and unusual within" the term. *Id.* at 1086.

By the mid-1980s—after *Holloway*, *Sommers*, and *Ulane II*—it was thus settled in the Seventh, Eighth, and Ninth Circuits that Title VII did not prohibit employment discrimination on the basis of transgender identity, and that result was premised in all three Circuits on congressional intent and a "plain reading" or "traditional definition" of the word "sex." Congress's intention in passing the sex amendment to Title VII, however, is a highly dubious basis for interpreting the statute. And the supposed plainness of that "plain reading"—which itself may have been premised on an intuition about what Congress would or would not have intended—is at least in tension with the contrary "layman's reaction" of Judge Grady in *Ulane I* (and seemingly shared by Judge Goodwin in the *Holloway* dissent) that discrimination on the basis of transgender identity "relate[s] to sex or ha[s] something to do with sex," 581 F. Supp. at 822, and might therefore be "because of sex." None of the opinions discussed the basis of either allegedly plain reading, or the source of the chasm between them, so I will do so below. But first I will discuss the effect of a Supreme Court decision that does not directly address transgender identity, but which, according to the Ninth Circuit, implicitly overruled *Holloway* (and if so, *Sommers* and *Ulane II* as well), and thereby shifted the direction of Title VII cases on this issue.

2.  *Gender Stereotyping and the Effect of* Price Waterhouse

The principal issues before the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), were questions of evidentiary burdens and causation in "mixed-motive" discrimination cases under Title VII. The Court produced no majority opinion—it issued a plurality opinion, two opinions concurring in the judgment, and a dissent—and part of the outcome was subsequently superseded by statute. *See Fields v. New York State Office of Mental*

*Retardation & Developmental Disabilities*, 115 F.3d 116, 123–24 (2d Cir. 1997) ("[Section 107(a) of the Civil Rights Act of 1991] modifies *Price Waterhouse* to make sure that a successful affirmative defense only limits the plaintiff's relief, rather than avoiding the defendant's liability."). One aspect of *Price Waterhouse* that survives, however, is a result of the fact that the plaintiff in that case did not allege her employer straightforwardly discriminated "against women because they are women," as the *Ulane II* Court described the reach of Title VII's prohibition of sex discrimination. Rather, she alleged that her employer discriminated against her because she was, in her employer's view, insufficiently feminine. By ruling in her favor, a majority of the Court agreed that Title VII reaches such claims of discrimination based on gender stereotypes.

The *Price Waterhouse* dissent stressed that "Title VII creates no independent cause of action for sex stereotyping," though it considered evidence of stereotyping by employers to be "quite relevant to the question of discriminatory intent." 490 U.S. at 294 (Kennedy, J., dissenting). Litigants and courts have sometimes nevertheless treated *Price Waterhouse* as having created an independent cause of action or a new theory of "gender stereotyping" discrimination under Title VII, and some of the arguments on the present motion treat gender stereotyping as a distinct theory. I agree with the *Price Waterhouse* dissent, however, that there is no independent gender-stereotyping cause of action separate from sex discrimination *per se*; rather, *Price Waterhouse* shows that gender-stereotyping discrimination *is* sex discrimination *per se*. That is, the plurality and concurrences do not create a fundamentally new cause of action, but rather rely on an understanding of the scope of Title VII's prohibition against discrimination "because of sex" that reaches discrimination based on stereotypical ideas about sex.

In the words of the *Price Waterhouse* plurality, the "simple but momentous announcement" that Congress made with Title VII was that "sex, race, religion, and national

19

origin are not relevant to the selection, evaluation, or compensation of employees," *id.* at 239 (except for "the special context of affirmative action," *id.* at 239 n.3). The plurality recognized the "somewhat bizarre path by which 'sex' came to be included as a forbidden criterion for employment . . . in an attempt to *defeat* the bill," *id.* at 244 n.9, but nevertheless considered legislative history pertaining to the rest of the Act (mostly legislative statements about race) as indicative of congressional intent that applied by analogy to sex. And by the plurality's reading, "Congress' intent to forbid employers to take gender into account in making employment decisions appears on the face of the statute," *id.* at 239, and the words that prohibit employment discrimination on the basis of sex "mean that gender must be irrelevant to employment decisions." *Id.* at 240. "In the specific context of sex stereotyping," just as an employer who simply refuses to hire a woman because she is a woman has acted on the basis of gender, so too an employer who "acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250.

The acknowledgement in *Price Waterhouse* that discrimination by means of gender stereotyping is discrimination "because of sex" under Title VII eventually led to a significant shift in the direction of decisions examining alleged discrimination on the basis of transgender identity. As the Ninth Circuit wrote, recognizing the abrogation of its earlier Title VII caselaw:

> The initial judicial approach taken in cases such as *Holloway* has been overruled by the logic and language of *Price Waterhouse*. In *Price Waterhouse,* which was decided after *Holloway* and *Ulane* [*I & II*], the Supreme Court held that Title VII barred not just discrimination based on the fact that Hopkins was a woman, but also discrimination based on the fact that she failed "to act like a woman"—that is, to conform to socially-constructed gender expectations. What matters, for purposes of this part of the *Price Waterhouse* analysis, is that in the mind of the perpetrator the discrimination is related to the sex of the victim: here, for example, the perpetrator's actions stem from the fact that he believed that the victim was a man who "failed to act like" one. Thus, under

> *Price Waterhouse,* "sex" under Title VII encompasses both sex—
> that is, the biological differences between men and women—*and*
> gender. Discrimination because one fails to act in the way expected
> of a man or woman is forbidden under Title VII.

*Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000) (citation omitted). The Court

therefore held, largely on the basis of *Price Waterhouse*, that the Gender Motivated Violence Act

(which parallels the sex discrimination standard of Title VII) reaches conduct motivated by

transgender identity and other gender nonconformity.

The Sixth Circuit came to the same conclusion in *Smith v. City of Salem*, 378 F.3d 566

(6th Cir. 2004). "[T]he approach in *Holloway, Sommers*, and *Ulane* [*II*]," it wrote, "has been

eviscerated by *Price Waterhouse*." *Id.* at 573. Rejecting the argument that transgender plaintiffs

sought to bootstrap a new protected class into Title VII, the Court reasoned that, on the contrary,

because discrimination "because of sex" reaches discrimination based on gender nonconformity,

the *exclusion* of discrimination on the basis of transgender identity from the protective scope of

Title VII would be to take a certain class of gender nonconformity and reclassify it as a

nonprotected status solely in order to exclude it:

> Discrimination against the transsexual is then found not to be
> discrimination "because of . . . sex," but rather, discrimination
> against the plaintiff's unprotected status or mode of self-
> identification. In other words, these courts superimpose
> classifications such as "transsexual" on a plaintiff, and then
> legitimize discrimination based on the plaintiff's gender non-
> conformity by formalizing the non-conformity into an ostensibly
> unprotected classification.
>
> . . .
>
> Such analyses cannot be reconciled with *Price Waterhouse,* which
> does not make Title VII protection against sex stereotyping
> conditional or provide any reason to exclude Title VII coverage for
> non sex-stereotypical behavior simply because the person is a
> transsexual.

*Id.* at 574–75. Discrimination on the basis of transgender identity is thus "no different from the discrimination directed against Ann Hopkins in *Price Waterhouse,* who, in sex-stereotypical terms, did not act like a woman." *Id.* at 575.

Similarly, the Eleventh Circuit in *Glenn v. Brumby* reasoned that:

> A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior. There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms.
>
> Accordingly, discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender.

663 F.3d 1312, 1316–17 (11th Cir. 2011) (quotation, modification, and citations omitted). And likewise the Equal Employment Opportunity Commission has written:

> When an employer discriminates against someone because the person is transgender, the employer has engaged in disparate treatment related to the sex of the victim. This is true regardless of whether an employer discriminates against an employee because the individual has expressed his or her gender in a non-stereotypical fashion, because the employer is uncomfortable with the fact that the person has transitioned or is in the process of transitioning from one gender to another, or because the employer simply does not like that the person is identifying as a transgender person. In each of these circumstances, the employer is making a gender-based evaluation, thus violating the Supreme Court's admonition that "an employer may not take gender into account in making an employment decision."

*Macy v. Holder*, 2012 WL 1435995 (E.E.O.C. Apr. 20, 2012) (quoting *Price Waterhouse*, 490 U.S. at 244) (citations and quotation omitted).

The only post–*Price Waterhouse* federal appellate decision to uphold pre–*Price Waterhouse* doctrine on transgender identity and Title VII is *Etsitty v. Utah Transit Authority*, 502 F.3d 1215 (10th Cir. 2007). In that opinion, the Tenth Circuit cited *Holloway* (without

acknowledging that the Ninth Circuit had already recognized it as abrogated), *Sommers*, and *Ulane II*, and agreed with them that "the plain meaning of 'sex' encompasses [no]thing more than male and female." *Id.* at 1221–22. It relied on "the traditional binary conception of sex" to conclude that "transsexuals may not claim protection under Title VII from discrimination based solely on their status as a transsexual." *Id.* at 1222. The Court separately described the "*Price Waterhouse* theory" of gender stereotyping, apparently as an independent theory of liability, but declined to decide whether it applied to transgender identity and ruled against the plaintiff on other grounds. *Id.* at 1224.

In sum, discrimination on the basis of transgender identity is now recognized as discrimination "because of sex" in the Ninth Circuit (as *Schwenk* recognized the abrogation of *Holloway*), the Sixth Circuit (as recognized in *Smith*), and in the Eleventh Circuit (as recognized in *Glenn*); and the E.E.O.C. (in *Macy*) and has agreed with that authority. Discrimination on the basis of transgender identity is regarded as not constituting discrimination "because of sex" in the Tenth Circuit (under *Etsitty*). The continued vitality the pre–*Price Waterhouse* decisions in the Seventh and Eighth Circuits (*Ulane II & Sommers*, respectively) is unclear.[8]

---

[8] In a related but distinct line of cases, courts have generally held that "Title VII does not prohibit harassment or discrimination because of sexual orientation." *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000). Under that rule, as the Second Circuit has recognized, "gender stereotyping claims can easily present problems for an adjudicator," *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005), because nonconformity with gender stereotypes is stereotypically associated with homosexuality—and Title VII thus prohibits discrimination on the basis of such nonconformity insofar as it is discrimination on the basis of the gender stereotypes but not insofar as it is discrimination on the basis of homosexuality. Thus, for example, a woman might have a Title VII claim if she was harassed or fired for being perceived as too "macho," but not if she was harassed or fired for being perceived as a lesbian, and courts and juries have to sort out the difference on a case-by-case basis.

U.S. District Judge Katherine P. Failla recently addressed that difficulty in *Christiansen v. Omnicom Group, Inc.*, 2016 WL 951581 (S.D.N.Y. March 9, 2016). She called for the reconsideration of *Simonton* and *Dawson*'s rule on the basis of its impracticability, also noting

3.   *"Because of Sex"*

The split in the caselaw on the question whether employment discrimination on the basis of transgender identity is prohibited by Title VII is the result of two competing views of the effect of the words "because of sex"—which, in turn, reflect two competing views of the meaning of the word "sex." Neither view has been very thoroughly explained or justified, but both purport to be plain readings.

The view typified by *Holloway*, *Sommers*, *Ulane II*, and *Etsitty* is that the "plain meaning" or "traditional binary conception" of sex means nothing more than "male and female," *see, e.g.*, *Etsitty*, 502 F.3d at 1221–22, and thus that discrimination "because of sex" can only mean discrimination "against women because they are women and against men because they are men," *Ulane II*, 742 F.2d at 1085. Discrimination against transgender people because they are transgender people, by that reading, is not discrimination "because of sex."

---

related changes to the legal landscape since those decisions were made, citing the Supreme Court's same-sex marriage opinions in *United States v. Windsor*, 133 S. Ct. 2675 (2013), and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), as well as the July 2015 decision of the E.E.O.C. that sexual-orientation discrimination *is* cognizable under Title VII. *Christiansen*, slip op. at 30–37, *12–15. The present case, however, is not determined by the holding of *Simonton*, as Judge Failla found *Christiansen* to be, because this case is about gender identity itself and the expression of that identity, and not about the orientation of romantic or sexual attraction—which, as the *Simonton* Court noted, may or may not be associated in a particular case with broader gender stereotypes. *See* 232 F.3d at 38 ("[N]ot all homosexual men are stereotypically feminine, and not all heterosexual men are stereotypically masculine."). My statutory analysis below might nevertheless suggest an additional statutory basis to support the reconsideration Judge Failla urges.

Another recent decision that addresses and exemplifies the changes to the legal landscape that Judge Failla describes, and which unlike *Christiansen* does pertain to transgender identity, is *Adkins v. City of New York*, 2015 WL 7076956 (S.D.N.Y. Nov. 15, 2015). *Adkins* is a Section 1983 case, and U.S. District Judge Jed S. Rakoff held that under the same analysis applied in *Windsor*, transgender people are a "quasi-suspect" class and therefore that disparate treatment alleged to violate the Equal Protection Clause is subject to the elevated "intermediate scrutiny" standard.

The view typified by Judge Grady's "layman's reaction" in *Ulane I* and implied by Judge Goodwin in his *Holloway* dissent—and apparent in varying degrees in the majority of post–*Price Waterhouse* cases—is less well described in the cases, but it interprets Title VII's prohibition of discrimination "because of sex" to include discrimination on the basis of factors that are sufficiently "related to sex or [that] ha[ve] something to do with sex." *Ulane I*, 581 F. Supp. at 822. Discrimination against transgender people because they are transgender people, by that reading, is quite literally discrimination "because of sex." A majority of the Supreme Court in *Price Waterhouse* agreed that discrimination on the basis of nonconformity with stereotypical gender norms constitutes discrimination "because of sex." That view is more expansive than the narrow *Ulane II* view and is consonant with Judge Grady's broader view in *Ulane I*, and subsequent cases have thus shifted markedly toward the latter.

I agree with those courts that have held that *Price Waterhouse* abrogates the narrow view of *Holloway*, *Sommers*, and *Ulane II*. Moreover, even without considering *Price Waterhouse*, I would conclude that that narrow view is erroneous and that Judge Grady's analysis was correct. The narrower view relies on the notion that the word "sex" simply and only means "male or female." That notion is not closely examined in any of the cases, but it is mistaken. "Male or female" is a relatively weak definition of "sex" for the same reason that "A, B, AB, or O" is a relatively weak definition of "blood type": it is not a formulation of meaning, but a list of instances. It might be an exhaustive list, or it might not be, but either way it says nothing about why or how the items in the list are instances of the same thing; and the word "sex" refers not just to the instances, but also to the "thing" that the instances are instances of. In some usages, the word "sex" can indeed mean "male or female," but it can also mean the distinction between male and female, or the property or characteristic (or group of properties or characteristics) by

which individuals may be so distinguished. Discrimination "because of sex," therefore, is not only discrimination because of maleness and discrimination because of femaleness, but also discrimination because of the *distinction* between male and female or discrimination because of the *properties or characteristics* by which individuals may be classified as male or female.

There is nothing unplain, untraditional, unusual, or new-fangled about this understanding. It is simply attentive to what the words in the statute mean, and what they have meant since long before the statute was formulated. The first definition of "sex" in Samuel Johnson's seminal 1755 dictionary—among the earliest and most influential English dictionaries ever published—is "[t]he property by which any animal is male or female."[9] That definition reflects the traditional binary conception of sex, but unlike the allegedly "plain" or "traditional" view of the pre–*Price Waterhouse* cases, it is clear that the word "sex" refers to the *property* by which individuals are so classified. That is consonant with the (harder to read, but more descriptive) second definition of "sex" in the much more recent *Webster's Third New International Dictionary*, which was published roughly contemporaneously with the passage of the Civil Rights Act: "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction . . . and that is typically manifested as maleness and femaleness . . . ."[10] The *Oxford English Dictionary*'s definitions of several senses of the word "sex" include a "[q]uality in respect of being male or female, or an instance of this" and "[t]he distinction

---

[9] Page View 1804, *A Dictionary of the English Language: A Digital Edition of the 1755 Classic by Samuel Johnson*, (Brandi Besalke ed.), http://johnsonsdictionaryonline.com/?page_id=7070&i=1804.

[10] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1961).

between male and female . . . ; this distinction as a social or cultural phenomenon, and its

manifestations or consequences . . . ."[11]

Discrimination on the basis of the "peculiarities" that "typically" manifest as maleness

and femaleness, or on the basis of "the property by which" people are classified as male or

female, is much broader than discrimination against women because they are women and

discrimination against men because they are men—it would surely include discrimination on the

basis of gender stereotypes, and just as surely discrimination on the basis of gender identity,

which Judge Grady rightly recognized as  "related to sex or ha[ving] something to do with sex"

by means of his "layman's reaction." *Ulane I*, 581 F. Supp. at 822.

Judge James Robertson of the U.S. District Court for the District of Columbia has issued

two thoughtful opinions in *Schroer v. Billington* (first on a motion to dismiss, 424 F. Supp. 2d

203 (D.D.C. 2006), and then after a trial, 577 F. Supp. 2d 293 (D.D.C. 2008)) in which he

recognized that Judge Grady was right that discrimination on the basis of transgender identity is

discrimination on the basis of sex. He made a useful analogy (which was in substance repeated

by the E.E.O.C. in *Macy*) to discrimination on the basis of religion:

> Imagine that an employee is fired because she converts from
> Christianity to Judaism. Imagine too that her employer testifies that
> he harbors no bias toward either Christians or Jews but only
> "converts." That would be a clear case of discrimination "because
> of religion." No court would take seriously the notion that
> "converts" are not covered by the statute. Discrimination "because
> of religion" easily encompasses discrimination because of a change
> of religion.

577 F. Supp. 2d at 306. No court would make such a mistake because no court would implicitly

define religion as synonymous with a purportedly exhaustive list of religions, and thus could not

conclude that discrimination "because of religion" must be limited to discrimination against

---

[11] Oxford English Dictionary Third Edition, December 2008,
http://www.oed.com/view/Entry/176989.

members of particular religions on the list because they are such members. Because Christianity

and Judaism are understood as examples of religions rather than the definition of religion itself,

discrimination against converts, or against those who practice either religion the "wrong" way, is

obviously discrimination "because of religion." Similarly, discrimination on the basis of gender

stereotypes, or on the basis of being transgender, or intersex, or sexually indeterminate,

constitutes discrimination on the basis of the properties or characteristics typically manifested in

sum as male and female—and that discrimination is literally discrimination "because of sex."

On the basis of the plain language of the statute, and especially in light of the

interpretation of that language evident in *Price Waterhouse*'s acknowledgement that gender-

stereotyping discrimination is discrimination "because of sex," I conclude that discrimination on

the basis of transgender identity is cognizable under Title VII.[12]

## IV.   Conclusion

Employment discrimination on the basis of transgender identity is employment

discrimination "because of sex" and constitutes a violation of Title VII of the Civil Rights Act.

HCC has not shown that the position Fabian sought is as a matter of law beyond the scope of

Title VII as a result of being for an independent contractor rather than an employee. And Fabian

has met her burden under *McDonnell Douglas* to make a *prima facie* case of discrimination and

to proffer sufficient evidence for a reasonable jury to find that the non-discriminatory reasons

HCC offers for not hiring her are pretextual. Whether the Hospital discriminated against Deborah

Fabian on the basis of her gender identity is a question for a jury. Because she has proffered

---

[12] I interpret the same way the parallel CFEPA provision, as it stood prior to the 2011
amendment that added "gender identity or expression" to the list of protected classes. *See* Conn.
Gen. Stat. § 46a-60. The fact that the Connecticut legislature added that language does not
require the conclusion that gender identity was not already protected by the plain language of
the statute, because legislatures may add such language to clarify or to settle a dispute about the
statute's scope rather than solely to expand it.

sufficient evidence for a reasonable jury to find that it did, the defendant's motion for summary

judgment is denied.

      So ordered.

Dated at Bridgeport, Connecticut, this 18th day of March 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge